FILED

MAR 2 4 2009

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

POSTED ON WEBSITE

NOT FOR PUBLICATION

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
FRESNO DIVISION

| | |
|---|---|
| In re | Case No. 07-10271-B-12 |
| John Menezes and<br>Linda Menezes, | |
| Debtors. | |
| Land O'Lakes, Inc., and<br>Land O'Lakes Finance<br>Company, | Adversary Proc. No. 07-1087 |
| Plaintiffs, | DC No. DLF-1 |
| v. | |
| John Menezes and<br>Linda Menezes, | |
| Defendants. | |
| John Menezes and<br>Linda Menezes, | |
| Third-Party Plaintiffs, | |
| v. | |
| Alvin L. Souza and Robyn G.<br>Souza, individually and dba<br>Alvin Souza Dairy, Frank Garcia,<br>Jr., an individual, | |
| Third-Party Defendants. | |

Land O'Lakes, Inc., and                    )
Land O'Lakes Finance Company,              )
                                           )
            Plaintiffs,                    )
                                           )
      v.                                   )
                                           )
Alvin L. Souza and Robyn G.                )
Souza, individually and dba                )
Alvin Souza Dairy,                         )
                                           )
            Third-Party Defendants.        )
_____)

## MEMORANDUM DECISION REGARDING BIFURCATED TRIAL

This memorandum decision is not approved for publication and may not be cited except when relevant under the doctrine of law of the case or the rules of res judicata and claim preclusion.

René Lastreto, II, Esq., and Lee Ann Eager, Esq., appeared on behalf of Land 'O Lakes, Inc., and Land O'Lakes Finance Company, plaintiffs.

Michael A. Dias, Esq., and Jonette M. Montgomery, Esq., appeared on behalf of defendants and third-party plaintiffs, John and Linda Menezes.

Joseph F. Soares, Esq., appeared on behalf of third-party defendants, Alvin and Robyn Souza.

John P. Bianco, Esq., appeared on behalf of third-party defendant, Frank Garcia, Jr.

## OVERVIEW.

Before the court is an adversary proceeding filed by Land O'Lakes, Inc., and Land O'Lakes Finance Company (collectively "LOL") against John and Linda Menezes (the "Menezes") and Alvin and Robyn Souza (the "Souzas"). The Souzas own and operate the Alvin Souza Dairy in Tulare, California, and are in the business of buying and selling dairy cows. Prior to 2007, the Menezes owned and operated the J & L Dairy, also in Tulare, California. The Menezes owed a substantial amount of money to LOL and LOL held a security interest in, *inter alia*, all of the Menezes' dairy cows.

On January 30, 2007, one day before the Menezes commenced this chapter 12 bankruptcy case, Alvin Souza removed a large number of dairy cows from the J & L Dairy (the "Removed Cows"). The actual number of Removed Cows is disputed, but appears to lie somewhere between 139 and 212. LOL contends, *inter alia*, that the

2

Menezes and the Souzas acted in concert to convert LOL's collateral. The Souzas contend that the Removed Cows never belonged to the Menezes and therefore were not part of LOL's collateral. The Menezes counter that the Souzas and third-party defendant Frank Garcia took the Removed Cows without their permission and have filed a third-party complaint against the Souzas and Frank Garcia for trespass and indemnity.

At the final pre-trial conference, the court bifurcated the issue of ownership of the Removed Cows and set that matter for two full days of trial, which was held on October 10, 2008, and February 20, 2009. The parties were granted leave to submit post-trial briefs. For the reasons set forth below, the court finds that the Menezes owned the Removed Cows at the time they were removed from the J & L Dairy.

**BACKGROUND AND FINDINGS OF FACTS.**

**The J & L Dairy Account.** For several years prior to September 2006, the Souzas sold dairy cows to the Menezes. The cows were usually sold in small groups, from one to twelve at a time, and the Souzas maintained a running open account for J & L Dairy (the "J & L Account"). Some of the early transactions were financed with the proceeds of a loan from LOL. A check from LOL in the amount of $60,000 was given to the Souzas in January 2004 and credited to the J & L Account.

When Alvin Souza delivered cows to the J & L Dairy, his ordinary business practice was to give his bookkeeper, Joy McGuire, a slip of paper with the information about the transaction. Ms. McGuire would prepare an invoice and the transaction was posted to the J & L Account. All transactions were reflected in monthly statements which were mailed to the Menezes. Each month, a finance charge was added to the J & L Account based on the outstanding balance. The Souzas sold cows to approximately 50 dairies and all of the transactions were processed in essentially the same manner.

The Menezes also boarded and fed heifers that were owned by the Souzas, but those cows were kept at a different location on Road 28. The Souzas credited the J & L Account for the value of those services. In addition, the Souzas bought heifers and silage from the Menezes for which the Souzas would also credit the J & L Account. The

Souzas paid cash for bull calves which they bought from the Menezes on occasion. Other than the initial transactions financed through LOL and the bull calf sales, all transactions between the Souzas and the Menezes were handled through debits and credits to the J & L Account. All transactions were documented with invoices, credit memos, and monthly statements, which Ms. McGuire prepared and mailed to the Menezes. The Souzas never requested or perfected a security interest in any of the cows they delivered to J & L Dairy.

**The Gregorio Cows.** On or about March 30, 2006, Alvin Souza caused to be delivered to J & L Dairy 148 dairy cows which the Souzas had purchased from the Gregorio Dairy in Turlock, California (the "Gregorio Cows"). The Gregorio Dairy was having financial difficulty. In the past the Souzas had sold cows to the Gregorio Dairy and when Gregorio could no longer care for his cows, he sold them (or gave them) back to the Souzas.[1]

The Gregorio Cows were hauled directly to the J & L Dairy. Alvin Souza called Tina Moody, the state brand inspector, to the J & L Dairy where she inspected the Gregorio Cows and completed a brand inspection certificate. (Exhibit 3A.)[2] The majority of the Gregorio Cows were Jersey and Jersey cross-bred cows with a few Holsteins. The Jerseys were small brown cows, easily distinguishable from the larger, black and white Holsteins. The Gregorio Cows were not in good health. The brands and eartags were varied, but none of the Gregorio Cows carried the Souzas' brand. After the

---

[1]The terms of the Souza-Gregorio transaction were not in the record. It is unclear whether the Gregorio Cows were purchased by the Souzas, repossessed, or simply credited to Gregorio's account.

[2]The brand inspection certificate is evidence of the breeds and brands of the Gregorio Cows, but it is not reliable evidence of ownership. It was agreed that the certificate was wrong in that it showed the Gregorio Cows being sold by the Menezes to the Souzas. Months later, at Alvin Souza's request, Ms. Moody issued a corrected brand certificate. (Exhibit 3M erroneously dated January 4, 2006.) That corrected brand certificate showed the Gregorio Cows being sold from "Alvin Souza 2 JL Dairy." Ms. Moody initially testified that the brand inspection is like a "pink slip" for an automobile. On further questioning by the court, she acknowledged that the brand inspection does not document or transfer title to cattle under California law.

4

delivery of the Gregorio Cows, Menezes, at his expense, placed his own eartags on the Cows, fed and milked the Cows, obtained veterinary services, and exercised other indicia of ownership over the Gregorio Cows.

The Souzas and the Menezes disagree on whether or not the Menezes actually purchased and acquired title to the Gregorio Cows. The Menezes contend that they purchased the Gregorio Cows on open account in the same manner as prior transactions with the Souzas. The Souzas first contended that the Gregorio Cows were being boarded at the J & L Dairy while the Souzas completed the remodeling of another dairy facility. However, Alvin Souza never took the Gregorio Cows to the new dairy facility.[3] At trial, Alvin Souza testified that John Menezes offered to buy the Gregorio Cows after they were delivered to the J & L Dairy. At that time (early April 2006), the J & L Account had an outstanding balance of $322,507.06. Alvin Souza contends that he agreed to sell the Gregorio Cows on the condition that the Menezes would pay for them. The Menezes had never purchased that many cows at one time, and all prior deliveries involved a small number of cows.

Shortly after the Gregorio Cows were delivered to J & L Dairy, Alvin Souza gave Joy McGuire a slip of paper relating to the transaction. (Exhibit 13.) The note she was handed was a plain piece of paper with the following handwritten information:

> "4-6-06
> J&L Dairy
> 148 Head
> $1100.00 per Head"

Based on that note, Ms. McGuire prepared an invoice to the J & L Dairy dated 4/6/06 (invoice no. 7357: the "April 6 Invoice"). That document showed the sale of 148 cows for a total of $162,800 and that amount was debited to the J & L Account. Subsequent statements for the J & L Account reflect monthly interest charges on that

---

[3] Alvin Souza testified that the remodeled dairy facility was to be completed in or around July 2006. The record is silent as to when the remodel work was actually completed.

5

1  transaction.

2      The Souza invoices show only one additional transaction involving the delivery of

3  cows to J & L Dairy after April 2006. On September 8, 2006, J & L Dairy was invoiced

4  for the "sale of [10] Springers" with a value of $15,750 (the "September Cows"). Alvin

5  Souza testified that he did not intend to transfer title to the Gregorio Cows, or to any other

6  cows delivered to J & L Dairy after March 30, 2006, unless he was paid for the cows.

7  There was no contemporary evidence to corroborate Alvin Souza's version of these

8  transactions.

9      **The LOL Loan Obligation.** At the commencement of this bankruptcy, the

10  Menezes had three outstanding loan obligations to LOL. According to their bankruptcy

11  schedules, by January 2007, the Menezes owed approximately $804,000 to LOL. The

12  Menezes had given LOL a security interest in all of their dairy cattle to secure repayment

13  of that debt. There is no dispute that LOL's security interest was properly perfected.

14  Further, there is no dispute that Alvin Souza knew about LOL's security interest.

15      The LOL loan officer responsible for supervision of the Menezes' account was

16  John Floden. Mr. Floden processed all of LOL's loans to the Menezes and he regularly

17  visited the J & L Dairy to inspect the dairy herd, LOL's collateral. Mr. Floden inspected

18  the J & L Dairy in April 2006, shortly after delivery of the Gregorio's Cows. At that

19  time, Mr. Floden counted about 720 cows in the Menezes' herd. (RT 113.) John Menezes

20  told Mr. Floden that he had purchased the Gregorio Cows from Alvin Souza. Nothing

21  was said to Mr. Floden about a boarding agreement or conditional sale arrangement with

22  the Souzas. (RT 111.) Mr. Floden was unaware of any instance when the Menezes did

23  not own the cows located at the J & L Dairy. (RT 112.)

24      **The Bankruptcy, the "Boarding" Agreement and Removal of the Cows.** By

25  late 2006, the Menezes were having financial difficulties and it was becoming clear that

26  they could not continue to operate the J & L Dairy without some bankruptcy relief.

27  Accordingly, the Menezes retained attorney Riley C. Walter, Esq., to advise and represent

28  them with regard to a possible bankruptcy filing. On at least one occasion in late January

6

1  2007, the Menezes, the Souzas, and Frank Garcia met at Mr. Walter's office to discuss,

2  *inter alia*, preparations for the Menezes' bankruptcy and possible ways to deal with the

3  Menezes' unsecured debt to the Souzas which, by that time, was more than $408,000 (the

4  "Attorney Meeting"). The Menezes knew that bankruptcy was inevitable and they wanted

5  to protect the Souzas. John Menezes described the purpose of that meeting as follows:

6           "I was concerned for Alvin Souza. We used to be the best of friends

7           . . . I didn't want him to get rooked. . . . Land O'Lakes, as everybody

8           knew, everybody, Land O'Lakes held a first on my dairy. Always.

9           They were trying to figure a way to get Souza behind Land

10          O'Lakes." (RT 26.)

11     With regard to the substance of the Attorney Meeting, John Menezes testified:

12          "They brought up all kinds of things. They brought up that . . . to keep

13          [Souza] in second. That's where I always kept hearing the words, to keep

14          [Souza] in second.

15          They brought up rental of the cows . . . And then they brought a boarding

16          [agreement]. They were talking, they kept talking. They were bringing up

17          all kinds of things.

18          . . . But there was nothing ever discussed, go pick up my cows." (RT 44-

19          45.)

20      Linda Menezes attended the Attorney Meeting and described the discussion as

21  follows:

22          "[W]e were filing bankruptcy, and we wanted to see what he could do to

23          protect Alvin [Souza] because, you know, [John and Alvin] were best

24          friends . . . And he didn't want Alvin to get hurt in a bankruptcy . . . . Well,

25          a lot of talk was between Riley [Walter] and Frank [Garcia] and John

26          [Menezes]. Alvin didn't say a whole lot. . . . But they were just trying to

27          figure a way out how to put Alvin like in a second position. (RT 259).

28     Sometime in November or December 2006, John Menezes called the LOL

7

representative, John Floden, and asked if LOL would have any objection to the Souzas taking a subordinate lien position against the Menezes' cattle. Mr. Floden acknowledged that LOL was not in a position to prevent the parties from entering into such a transaction. (RT 115-116.)

After the Attorney Meeting, Alvin Souza prepared a document entitled "Agreement" which bears the Menezes' and Souzas' signatures and a date of January 27, 2007 (Exhibit F: the "January 27th Document). The January 27th Document purports to memorialize a prior agreement whereby the Menezes would board 175-200 "mature Holstein dairy cows ("Livestock") owned by [the Souzas]." The pertinent provisions of the January 27th Document were stated as follows:

1. **LIVESTOCK**: Second Party [the Souzas] has a surplus of Livestock which began being housed approximately July 1, 2006, at the Menezes facility. The parties agree that all such Livestock have the brand of Second Party ("AS") and are owned solely by Second Party. Said dairy cows consist of approximately 175-200 head of Livestock.

2. **BOARDING:** Second party has been negotiating a dairy lease (and has now signed said dairy lease) with Phyllis Faria Lemon and Ronnie Lemon for the leasing of their dairy facility ("Faria Facility") and for the temporary leasing of a smaller dairy facility owned by James William Rowley and Vicki Rowley, husband and wife, individually and doing business as Rowley Ranch ("Rowley Facility"). Until the Faria Facility is possessed by Second Party, Second Party has had to house some of Second Party's Livestock at other facilities, including but not limited to the Menezes['] Facility.

3. **CONSIDERATION:** As consideration for the same, First Party [the Menezes] has been and shall be entitled to retain all production from the Livestock of Second Party. In exchange, First Party shall be obligated to feed, house, care for and board the Livestock of Second Party.

4. **TERMINATION:** Second Party has had the right at any time to terminate this

8

1    Agreement and repossess Second Party's Livestock.  It is Second Party's

2    understanding that an attachment has been placed on First Party's milk check with

3    Land O'Lakes which places in serious jeopardy the ability of First Party to feed,

4    house, care for and board the Livestock of Second Party.  As a result thereof, First

5    Party and Second Party do hereby agree to effectuate the termination of this

6    Agreement and Second Party shall be entitled forthwith to remove all Livestock of

7    Second Party from the Menezes['] Facility referenced above

8        On the evening of January 30, 2007, Alvin Souza appeared at the J & L Dairy with

9    some cattle trailers and began removing between 139 and 212 cows from the various

10   pens.  The Menezes had left the J & L Dairy and were at their home in Visalia.  Most of

11   the Removed Cows were Holsteins.  Alvin Souza contends that he only removed the cows

12   that were marked for removal by the Menezes' employees and he produced a handwritten

13   list of the cows (identified by eartag number) which he contends are the Removed Cows.

14   (Exhibit 3C.)  However, there was no evidence to correlate the Removed Cows with those

15   cows identified as the "175-200 head of Livestock" in the "January 27th Document."  John

16   Menezes testified that Alvin Souza took the Holsteins, his "best cows."  It is clear that

17   Alvin Souza did not try to identify and remove only the Gregorio and September Cows.

18   Alvin Souza even testified that he could not recognize the Gregorio Cows which he

19   purported to own, but he certainly knew the difference between a Jersey and a Holstein.

20       After the Removed Cows were taken from the J & L Dairy, Joy McGuire prepared

21   a credit memo dated January 30, 2007 (credit memo no. 8817B), which stated: "150 head-

22   Cost of Springers" at the rate of $1,400 each.  Ms. McGuire prepared this credit memo at

23   the instruction of Alvin Souza and a credit was posted to the J & L Account in the amount

24   of $210,000.  This bankruptcy was filed the next day.  None of the Removed Cows were

25   returned to the J & L Dairy after the bankruptcy filing.

26   **ISSUES PRESENTED.**  The only issue to be decided by the court in this bifurcated

27   proceeding is ownership of the Removed Cows: On the night of January 30, 2007, was

28   Alvin Souza merely picking up his own cattle as contemplated in the January 27th

1    Document, or did Alvin Souza remove the Menezes' cattle?[4]

2    **ANALYSIS AND CONCLUSIONS OF LAW.**

3        **Applicable Law.** There is no dispute that all or most of the cattle on the J & L

4    Dairy at the time had been delivered there through some transaction with the Souzas. The

5    Menezes contend that all of the cattle they acquired from the Souzas were purchased on

6    open account as reflected in the invoices and statements for the J & L Account. A

7    contract for the sale of goods in California is governed by California's Commercial Code.

8    Generally, unless the parties "explicitly agree" to a different arrangement, title to "goods"

9    passes at the time of delivery and any reservation of interest by the seller is limited to a

10   security interest. The guiding rule is Cal.Com.C. § 2401, which states in pertinent part:

11           Insofar as situations are not covered by the other provisions of this

12           division and matters concerning title become material the following

13           rules apply:

14           (1) Title to goods cannot pass under a contract for sale prior to their

15           identification to the contract (Section 2501), and unless otherwise

16           explicitly agreed the buyer acquires by their identification a special

17            property as limited by this code. Any retention or reservation by the seller

18           of the title (property) in goods shipped or delivered to the buyer is limited in

19           effect to reservation of a security interest. Subject to these provisions and

20           to the provisions of the division on secured transactions (Division 9), title to

21           goods passes from the seller to the buyer in any manner and on any

22           conditions explicitly agreed on by the parties.

23           (2) Unless otherwise explicitly agreed title passes to the buyer at the

24           time and place at which the seller completes his performance with

25           reference to the physical delivery of the goods, despite any

26           reservation of a security interest and even though a document of title

27

28

---

[4]Specifically reserved for further adjudication are issues involving the number and value of the Removed Cows. Also reserved for further trial is whether the Removed Cows were taken with or without the Menezes' consent.

1   is to be delivered at a different time or place; and in particular and

2   despite any reservation of a security interest by the bill of lading.

3   The term "goods" as used in § 2401 includes cattle and other animals. *Clifton*

4   *Cattle Company, Inc. v. Robert Thompson,* 43 Cal.App.3d 11 (1974).  In the case of a

5   contract governed by Division 2 of the Cal. Com. Code, "unless otherwise explicitly

6   agreed title passes to the buyer when the seller completes physical delivery of the goods."

7   *In re G. Paoletti, Inc., v. G. Paoletti Co., Inc.*, 205 B.R. 251 (Bankr. N.D. Cal. 1997).

8   **Application to This Case.**  Here, all of the Removed Cows were located at the J &

9   L Dairy.  As to those cows which the Menezes acquired through some transaction with

10  the Souzas, the Souzas had completed their performance in terms of identification and

11  physical delivery of the cows.  There was no evidence to show that the Souzas had

12  delivered any cows to the J & L Dairy that were not invoiced and posted to the J & L

13  Account.  Therefore, pursuant to California law, title to all of the cows delivered to J & L

14  Dairy passed to the Menezes upon identification, delivery and acceptance by the Menezes

15  unless there was an explicit agreement otherwise.  The Souzas bear the burden of proving

16  the existence of that "explicit agreement."

17  Alvin Souza stated that he did not intend to transfer title to the Gregorio Cows, or

18  any other cows delivered to J & L Dairy after March 30, 2006, without payment.  The

19  Menezes contend that they purchased the cows.  The intent of the parties is determined at

20  the time of the sale.  "The primary goal of contract interpretation is to give effect to the

21  parties' intent as it existed at the time of contracting." *Spinks v. Equity Residential*

22  *Briarwood Apartments,* 2009 WL 531206, 7 (Cal.App. 6 Dist. 2009), citing Civ.Code, §

23  1636, and *Waller v. Truck Ins. Exchange, Inc.* 11 Cal.4th 1, 18 (1995).

24  Looking to the intent of the parties, the California Supreme Court has held that the

25  ownership of cattle can transfer to the buyer even the absence of payment or delivery.  In

26  *Clark v. Rush*, 19 Cal. 393 (1861), the defendant agreed to purchase two bull calves at an

27  auction at the seller/plaintiff's ranch.  The defendant told the plaintiff, "'Let the bulls

28  remain until morning, when I will send and get them away,' to which plaintiff assented."

11

1   *Id.* at 394. A few days later, the seller had to leave, but he told his employees to deliver
2   the bulls to the defendant when he sent for them. A couple of weeks later the defendant
3   sent a man to get the bulls, but the plaintiff was away. One calf had died about two
4   weeks after the sale; the other died soon thereafter. The defendant refused to pay for the
5   bulls and argued at trial that there had been no change in ownership. A jury found for the
6   seller/plaintiff and judgment was entered against the defendant for nonpayment.

7       On appeal, the court ruled that the terms of sale were cash or note with sureties,
8   but these terms were waived and there was delivery and acceptance of the bulls. The
9   instructions left by the plaintiff, to deliver the bulls whenever the defendant called for
10  them, did not include any qualification as to payment, and, "the language and conduct of
11  the parties were such as to justify the conclusion that the cattle were regarded as the
12  property of the defendant. They were exhibited at the sale, and he bought them with a full
13  understanding of the character of the purchase, and afterwards sent for them without
14  offering to comply with the original [payment] terms of the sale." *Id.* at 396.

15      This court has, throughout its review of the record, endeavored to find an "explicit
16  agreement" between the parties to support any of the Souzas' arguments. There simply
17  was not one. The fact that the parties had the Attorney Meeting in late January 2007, and
18  needed to discuss "all kinds of things" because John Menezes "didn't want [the Souzas]
19  to get rooked" in the bankruptcy strongly suggests that the parties had not previously
20  agreed to any arrangement to protect the Souzas. The fact that the parties had to explore
21  ways to give the Souzas a junior lien on the Menezes' dairy herd conflicts with the
22  Souzas' argument that they never sold the Removed Cows in the first place. The fact that
23  the Souzas have tried to advance so many different and conflicting theories in this case
24  supports the conclusion that the parties never "explicitly agreed" on any of those theories.

25      The Souzas first alleged in their answer to the third-party complaint (paragraph 5)
26  that the Menezes were indebted to the Souzas "under a lease for cows." The suggestion
27  there is that some or all of the Removed Cows were merely being leased to the Menezes.
28  Indeed, John Menezes testified that some of the early discussions in the Attorney Meeting

12

1   involved the possible "rental" of cows.  However, there was no evidence introduced at
2   trial regarding any lease agreement between the Souzas and the Menezes and nothing in
3   Souzas' invoices and monthly statements reflects the existence of a lease agreement.
4   Based thereon, the court concludes that the Souzas have abandoned their "lease" theory.
5        The Souzas also pled in response to the third-party complaint (paragraph 9) that
6   some portion of the cows in Menezes' possession belonged to the Souzas pursuant to the
7   January 27th Document.  However, the January 27th Document was prepared months after
8   the Gregorio Cows and the September Cows were delivered to the J & L Dairy.
9   Moreover, the January 27the Document does not identify which cows it applies to.  It
10  clearly does not relate to the Gregorio Cows because they were primarily Jersey cows
11  without the Souzas' "AS" brand.  The January 27th Document refers to mature Holsteins
12  with the Souzas' brand.  After the Gregorio Cows were delivered in March 2006, the
13  Souzas only delivered ten additional cows in September 2006.  The record is silent as to
14  which "175-200 mature Holsteins" the Document refers to.  The testimony at trial, and
15  the January 27th Document itself, strongly suggest that the January 27th Document was an
16  artifice prepared solely to minimize the Souzas' financial exposure once the bankruptcy
17  was filed.  The court is not persuaded that the January 27th Document bears any
18  relationship to the intent of the parties at the time any cows were delivered to J & L
19  Dairy.
20       The parties' intent can be inferred from their conduct at the time.  The Souzas'
21  invoices show that 158 cows were delivered to J & L Dairy between August and
22  September 2006.  Consistent with his prior course of business, Alvin Souza invoiced
23  those cows to the Menezes as sales and posted the transactions to the J & L Account.
24  Consistent with his prior practice, John Menezes kept those cows in the pens mixed with
25  all of his other cows, as opposed to segregating them to the Road 28 facility.  John
26  Menezes put the J & L Dairy eartags on all of the cows, without any objection from Alvin
27  Souza.  John Menezes paid the veterinarian to check all of the cows delivered to the J & L
28  Dairy.  Throughout all of this, Alvin Souza never objected and he did nothing to put LOL

13

1   on notice that a substantial portion of J & L's herd, at least 158 cows, should not be
2   counted as part of LOL's collateral.  The conduct of the parties does not support the
3   Souzas' contention here that the Removed Cows did not belong to the Menezes.

4           In their pre- and post-trial briefs, the Souzas argue that all cows delivered to J & L
5   Dairy, beginning with the Gregorio Cows in March 2006, were merely being boarded at J
6   & L until the Souzas could complete the remodel of another dairy facility.  The argument
7   fails for two reasons.  First, Alvin Souza did not remove the Gregorio Cows, he removed
8   Menezes' best Holsteins, so any "boarding" agreement relating to the Gregorio Cows is
9   irrelevant.  Second, the record does not support the finding of an "explicit boarding
10  agreement," even for the Gregorio Cows.  Joy McGuire was not told about the "boarding"
11  agreement.  Indeed, she was told to prepare invoices for all of the cows delivered to J & L
12  Dairy.  Those transactions were posted to the Menezes' account as sale transactions and
13  assessed substantial interest charges each month, consistent with the ordinary course of
14  business between the parties.

15          The Souzas contend in both their pre- and post-trial briefs that Ms. McGuire
16  misunderstood Alvin Souza's instructions about the Gregorio Cows and prepared the
17  April 6 Invoice in error.  The Souzas contend that the note from which Ms. McGuire
18  prepared the April 6 Invoice was supposed to be a quote for the price of the Gregorio
19  Cows, not an invoice.  Again, this argument is irrelevant since Alvin Souza did not
20  remove the Gregorio Cows.  Further, at trial, Alvin Souza contradicted this argument
21  under cross-examination by Mr. Lastreto:

22                  Q.  Now, the Gregorio cattle that we've talked about today, those
23                  were delivered directly to Mr. Menezes' facility; is that right?
24                  A.  Right.
25                  Q.  And Mr. Menezes eventually told you he wanted to buy them; is
26                        that correct?
27                  A.  Right.
28  ///

1    Q. And when he told you he wanted to buy them, you invoiced

2    them?

3    A. Right.

4    Q. You added them to your statement of account?

5    A. Right.

6    Q. You continued to charge interest on that account?

7    R. Right.

8    Q. You told Joy McGuire to invoice Mr. Menezes for the purchase of

9    those hundred and forty-eight head?

10   A. Right.

11   Q. And you gave Ms. McGuire a written note to go ahead and

12   invoice Mr. Menezes for that hundred and forty-eight head?

13   A. At the time he told me he was going to buy them, I did.

14   (RT 364-65.)

15   Alvin Souza offered no explanation for why the 10 September Cows were also

16   invoiced and posted to the J & L account in the same manner. Neither did he offer a

17   credible explanation of why the April 6 Invoice remained on the J & L Account and

18   accumulated finance charges for months. Ms. McGuire testified that Alvin Souza said

19   nothing about a boarding agreement in 2006 and that she prepared those invoices

20   consistent with past business practice. The court found Ms. McGuire's testimony to be

21   candid and credible. The court is not persuaded that Ms. McGuire misunderstood

22   anything about Alvin Souza's intent when he gave her the document from which she

23   invoiced the Gregorio Cows as a sale transaction and posted that sale to the J & L

24   Account.

25   Contrary to the "boarding" theory, the Souzas argue in their post-trial brief that the

26   Gregorio Cows were sold to the Menezes under a conditional sales contract whereby title

27   would not pass unless and until the Souzas received payment. There is nothing in the

28   record, other than Alvin Souza's ambiguous testimony, to support his argument. The

15

Gregorio Cow transaction was not documented as a "conditional sale." The "conditional sale" term was not "explicitly agreed" to by the Menezes. LOL was not told about any "conditions" attached to its collateral. Alvin Souza's testimony here is simply unpersuasive. As a matter of law, any interest the Souzas may have intended to retain in the Gregorio Cows was nothing more than an unperfected security interest. Cal.Com.C. § 2401(1). Again, the argument is irrelevant because Alvin Souza did not come to the J & L Dairy on the night of January 30, 2007, to remove the Gregorio Cows.

Finally, there was a clear disconnect between the Gregorio Cows and the Removed Cows. The Gregorio Cows were mostly poor quality Jerseys; the Removed Cows were the Menezes' best Holsteins. To get around this contradiction, the Souzas shift away from the Gregorio Cows and argue in their post-trial brief that 175-200 of the cows on the J & L Dairy were "boarded cows." Presumably, this new argument refers back to the 175-200 Holsteins mentioned in the January 27th Document. However, the court has already found that the January 27th Document was a fabrication with no bearing on the parties' intent or the "title" issue. This new "boarded cows" argument raises more questions than it answers. Since the January 27th Document does not apply to the Gregorio Cows, what new group of cows are the Souzas referring to here? Do the Souzas now contend that there were another 175-200 Holsteins on the J & L Dairy that do not appear anywhere in the billing invoices and statements? There is nothing in the record to show how, when, or under what terms this new group of "boarded cows" happened to be at the J & L Dairy. Their existence certainly was not evident in any "explicit agreement" between the parties.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

16

1 | **CONCLUSION.**

2 |     Based on the foregoing, the court finds and concludes that title to the Removed
3 | Cows was vested in the Menezes at all times relevant to this adversary proceeding. As to
4 | all cows which the Souzas delivered to the J & L Dairy, title passed to the Menezes upon
5 | delivery by Alvin Souza, acceptance by John Menezes, and preparation of the invoices by
6 | Joy McGuire. At that point, the Souzas' performance with regard to physical delivery of
7 | the cows was complete and title to those cows passed to the Menezes as a matter of law.
8 | There was no "explicit agreement" to the contrary.

9 |     Dated: March _____, 2009

11 | W. Richard Lee
12 | United States Bankruptcy Judge

17